DAVID M. QUEEN, plaintiff in error, *vs.* THE CITY OF ATLANTA, defendant in error.

1. Where commissioners of police have jurisdiction to try members of the police force of a city, for immoral or disorderly conduct, their judgment that a policeman has been guilty of such conduct is conclusive until reversed.

2. Seduction under promise of marriage, followed by desertion, failure to provide for the seduced and her offspring, and the consequent death of both, constitute continuous acts of immorality; and, al-

though the actual seduction by the policeman may have occurred before the creation of the board of commissioners, and before his connection with the police force, yet his subsequent conduct gave the commissioners jurisdiction of the case.

3. Having been so adjudged guilty and discharged, he cannot recover from the city his salary for the remainder of his term.

BLECKLEY, Judge, dissented.

Municipal corporations. Officers. Judgments. Jurisdiction. Before Judge CLARK. City Court of Atlanta. June Term, 1877.

Reported in the opinion.

HOPKINS & GLENN, for plaintiff in error.

W. T. NEWMAN, for defendant.

WARNER, Chief Justice.

The plaintiff brought his action against the defendant to recover the sum of $480.00, alleged to be due him for his services as a policeman, under a contract made with the defendant for the year 1874. The defendant pleaded that the plaintiff had been arraigned before the board of commissioners of the city of Atlanta, and charged with a violation of the ordinances and rules for the government of said city, to-wit: with conduct unbecoming a member of the police force, of which charge, and of the time of trial, the plaintiff had due notice; that he appeared and was represented by counsel, and, after a full and fair trial, he was, by said board, found guilty of the charges and dismissed from the police force. On the trial of the case, the jury found a verdict for the plaintiff for the amount sued for. Whereupon the defendant made a motion for a new trial, on the ground that the verdict was contrary to law and contrary to the evidence. The court granted a new trial on the ground that the verdict was contrary to law, and the plaintiff excepted.

It appears from the minutes of the board of police commissioners, containing their proceedings, at a meeting held by them on the 7th of April, 1874, which was offered in evidence, "that policeman D. M. Queen was arraigned and tried for immoral and disorderly conduct in the seduction of Georgia Teat, thereby causing her death at childbirth, found guilty and discharged, April 7, 1874." Dodd, chairman of the board of police commissioners, testified that he was present in that capacity at the trial of D. M. Queen; that he was tried on the charge, as above set forth, on the 7th of April, 1874. The evidence before the board satisfied them that Queen had seduced Georgia Teat in 1873. The board had before them Dr. Miller, Calloway, and several members of the grand jury, who testified that Georgia Teat told them, before she died, that Queen was her seducer; that he seduced her under promise of marriage, and afterwards refused to have anything to do with her—refused to assist her up to the time her child was born; that she was poor and needed assistance; that her child was born in March, 1874. She died in childbed, and her child also died. Upon this testimony the board discharged Queen from the police force of the city. To this decision of the board of commissioners there was no exception taken, by *certiorari* or otherwise.

By the charter of the city of Atlanta, the board of police commissioners are authorized to "exercise full direction and control of the officers and members of the police force in conformity to existing laws and ordinances, and such as may be made applicable to the subject; and, for a failure to perform any duty required by law, or the city ordinances, they may be suspended or removed from office by the board of police commissioners." One of the ordinances of the city declares that, if any of the police force, or policemen, shall, at any time, become intoxicated, or under the influence of liquor, or fail, neglect or refuse to perform all duties as the laws or ordinances of the city may require, or shall be guilty

of any *immoral* or disorderly conduct, such policeman so offending, if found guilty, shall be fined, reprimanded or removed from office, or all, in the discretion of the police commissioners, they having the same power now in that respect as the mayor and council formerly had.

Although the commissioners' court (if it may be so called) was a court of limited jurisdiction, still it had jurisdiction of the person of Queen, as a policeman, and of the subject matter of his conduct as such policeman, and its judgment in relation to that conduct as a policeman, was as conclusive upon him as any other judgment, until reversed or set aside. It is no answer to say that the judgment was erroneous, and that it might have been reversed on a writ of *certiorari* for the admission of illegal evidence before the commissioners (though that evidence does not appear to have been objected to), or that the commissioners erred in their judgment in passing on that evidence. It is true, the evidence shows that the child was begotten before his appointment as a policeman, but the evidence also shows that the victim of his lust and false promises was poor, and needed assistance from the time he was appointed policeman in January, 1874, until her death in March, 1874, and that he refused to assist her, or contribute anything towards her support, from the time of his appointment up to the time of her death, in March thereafter. Inasmuch as it was proven to the satisfaction of the commissioners that Queen was the father of Georgia Teat's illegitimate child, begotten before his appointment, which fact, when brought to their knowledge, coupled with the other fact of his conduct towards her after his appointment, constituted in the judgment of the commissioners such *immoral* conduct on his part as would authorize them to discharge him in the exercise of that discretion vested in them by the charter and ordinances of the city before cited. Whether that judgment was erroneous or not, is not now the question; it is conclusive upon him until reversed or set aside.

Let the judgment of the court below be affirmed.

JACKSON, Judge, concurring.

The police commissioners, in my judgment, have full control of the police force of the city of Atlanta. It is their duty to see to it that this force is fit for duty, and they may take cognizance of any conduct of the police, past or present, which unfits them, or either of them, for duty. If the commissioners, in passing upon the conduct of a policeman, either past or during his term on the police force, should do him wrong, when they try him, he has his remedy by *certiorari* to the superior court, and ultimately, by appeal, to this court. But if he neglect so to do, he is concluded by the trial before them and their judgment from again opening the case by a new suit for damages. It is *res adjudicata.* He is concluded by the judgment, which he saw fit not to appeal from, or to move to set aside in the court which pronounced it. I think that before they judge him and discharge him, *they ought to try* him. It would certainly be harsh to turn him out without a hearing, no matter what he had done; but after a fair hearing of the witnesses against him and for him, if he produces any, and judgment unexcepted to, it would be illegal and wrong to permit him to be heard again on a new suit and try the whole thing over again.

The jurisdiction of the commissioners extends over his whole character and conduct. And it ought to be so. Suppose that, by inadvertance or ignorance, they employ a man who had robbed or murdered the year before, and whose character had been that of a violator of the very laws he was paid by the city to enforce, must they keep him to rob or murder others? Ought they not to turn him out? And before turning him out, ought they not to try him, to give him a fair hearing? It seems to me clearly so. It would certainly be harder upon him to turn him out without trial than after a full hearing from him and his witnesses.

But conceding that they could try him only for counduct after he became a policeman, and that their jurisdiction ex-

tended only to that conduct, then the jurisdiction in this case was complete. The charge against him was, in effect, that he seduced a girl under promise of marriage, and that she died in consequence of his bad treatment in thus seducing her.

To hold a police court to strict pleading would be to destroy, almost if not altogether, its usefulness; and the sum and substance of the charge against him, for which he was tried and condemned, was his immoral conduct in seducing her by promising to marry her, and then failing to marry her, but neglecting her in poverty and shame, and leaving her to die in that destitution and neglect. This seduction and bad conduct was not one act. Seduction is never one act, I suppose. This conduct began with the attempt to seduce—then the cohabitation—then the refusal and failure to marry her—then the leaving her to die poor and unfriended; and this conduct extended from the summer of 1873 to the last of March, 1874, when she died. The most immoral, the meanest, part of the conduct was the last. To seduce a woman, is badly immoral; to seduce her under the false promise to marry her, is more immoral and worse; to fail to marry her, after ample time to deliberate over the great wrong he had done her, is still more base and immoral; and to desert her to die in penury and want, caps the climax to the gross immorality of the transaction. The failure to redeem his pledge and marry her, extended up to April, 1874, after he had been on the police force for three months; and his neglect of her in death was while he was a policeman. The police court found that he had done these things; they thought it immoral; I think so too; but if I did not so think, I would not control their judgment on a question of immoral conduct of which the law made them the judges. I concur, therefore, in the judgment rendered by the chief justice.

BLECKLEY, Judge, dissenting.

When I differ with the court, I hope I am wrong, for I would rather err in opinion than for the court to err in judgment. Still, I must abide by my convinctions, and declare them. I do so in the present instance, with no zeal whatever to establish like convictions in the minds of others.

The board of police commissioners had no existence until March, 1874. Their powers are defined by the city charter, one of which is to suspend or remove members of the police force, "for a failure to perform any duty required by law or the city ordinances." This is to be done by accusation and trial, in the manner prescribed by ordinance. They are required to "keep a record of their proceedings." Acts of 1874, pamph. p. 135. Their proceedings against Queen are thus recorded in their records: "Policeman D. M. Queen was arraigned and tried for immoral and disorderly conduct, *in the seduction* of Georgia Teat, *thereby* causing her death at childbirth." "April 1st, 1874." "Found guilty, April 7th, 1874." As I understand this accusation, it charges no act but seduction, and the death is alleged to have been the consequence of that act. No other consequence is specified. There is no allusion to any failure, either to aid the mother or support the child. The evidence introduced by the city on the trial of the present case, shows that the seduction took place in 1873; that the child was born in March, 1874; that the mother died in child-birth, and that the child also died. Thus, it appears that the police commissioners took jurisdiction of an act of seduction which was committed before their own creation as a board, and before Queen was connected with the police, other evidence in the case showing that he was not elected or appointed by the city council until January, 1874. In so doing, I think they transcended their powers as a judicatory, and that their judgment is void. I have tried to bring my mind to an agreement with

my brethren, by looking at the proceeding as a trial for murder, and considering the mortal blow as given in 1873, and the death not produced, and consequently the crime not complete, till March, 1874. But the truth is, seduction is not homicide, in legal contemplation, though conception be consequent thereon, and death be consequent on parturition. Nor does the morality of seduction depend on results in the particular case. The seducer is equally immoral, whether the seduction be fruitful or unfruitful. The immoral conduct for which Queen was tried and found guilty, was complete in 1873. His act was consummated, and its moral character was fixed forever. The police commissioners, as a court, can deal with policemen only for what they do after they assume the obligations of policemen. If there is a law or ordinance which requires policemen to relieve or support the women they may have seduced, or the bastards they may have begotten, any failure to comply with such law or ordinance would be cause for removal. But it would be very singular for a city to retain seducers who were good in furnishing support, and dismiss those who were not. The scandal of such a line of discrimination would be very great. It occurs to me, that it would be unseemly, in the last degree, to make the police commissioners supervise, judicially, the members of the police force in duties springing out of past immorality and shame. My belief is, that there is no law or ordinance to try a policeman, as such, for failure to provide for his mistress or his unacknowledged offspring. I think Queen was not tried for anything of the kind, but that he was tried alone for the immorality of seducing a woman, the remote result being the woman's death. This is according to the record; and, I doubt not, the record states the accusation as the commissioners understood it. They found him guilty of the seduction, and for that they discharged him.

While I think they could not, as a court, deal with him for conduct ante-dating his appointment, I think they could,

as executive agents of the city, terminate his engagement for good cause, just as any other employer could do in respect to an employee in a position of trust and confidence, who was hired as a sheep, but turned out to be a wolf in sheep's clothing. Seduction committed during the preceding year might be cause, if unknown at the time of the engagement, and discovered afterwards. I suppose it would be; for the watchmen of a city ought not to be recent betrayers of women. Having a seduced woman on one's hands, with or without a child, might be cause also, whether she was attended to and duly cared for or not. It would add little to the feeling of security on the part of the public to know that, though there were seducers on the force, they were very scrupulous in providing for their victims. Executive, instead of judicial discharge, would involve no question of jurisdiction, but only a question of justification. On this, the policeman could have a fair and full trial in a suit for his wages. The city could defend by pleading and proving that the seduction or other cause alleged was true in fact; and the policeman could have the benefit of testimony in his favor. I grant that, in a proper case for judicial discharge, the decision of the commissioners, unreversed, would be conclusive. And were the present a case of that character, I should concur in the judgment. But, believing that the commissioners had no judicial cognizance of the matter on which they adjudicated, and the defence to the present action having been put by the plea and the evidence solely on that adjudication, I think the action was not successfully defended, and that the verdict of the jury should not have been disturbed.